IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GIORA GRIFFEL, et al., | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | NO. 23-193 |
| RSUI GROUP, INC., | |
| *Defendant.* | |

PAPPERT, J.                                                                                    December 11, 2023

**MEMORANDUM**

Covington Specialty Insurance Company insured Giora Griffel and his company, Sedgley Building LLC, under a commercial general liability policy. Griffel leased a commercial property located on East Sedgley Avenue in Philadelphia to BDDW Garments LLC. Halfway through the lease term, BDDW sued Griffel and Sedgley in state court, alleging breach of contract, breach of the covenant of quiet enjoyment and tortious interference with contractual relations. Covington denied coverage, so Griffel sought declaratory relief in state court, arguing Covington was obligated to defend and indemnify him in the BDDW litigation. Covington removed the case to federal court and it and Griffel filed cross-motions for summary judgment. After reviewing the record and the parties' submissions, the Court grants Covington's motion and denies Griffel's.

I

A

In March 2018, BDDW entered into a five-year commercial lease agreement for the second and third floors, as well as a parking lot, of a warehouse owned by Sedgley.

(BDDW CCP Am. Compl. ¶¶ 14-16, 18, 58 ("underlying complaint.")) BDDW used the warehouse to store drawers it installs in various pieces of furniture it sells. (*Id.* ¶¶ 30-32, 76.) When the parties entered their contract, the building's roof was being repaired so one provision of the lease allowed BDDW to pay half the monthly rent until the roof was "fully repaired." (*Id.* ¶ 22.) The lease further permitted Griffel or his agents to enter the leased property for inspection purposes "at reasonable times and upon reasonable notice," and gave BDDW "unfettered access to the loading area and elevator," which were in a common area it would share with the first-floor tenant. (*Id.* ¶¶ 45-46, 56-57.)

BDDW alleges it was "unable to enjoy use of the [p]roperty" because Griffel never repaired the roof, even though BDDW "consistently notified" him of leaks. (*Id.* ¶¶ 20, 24.) Griffel said he had begun working on the roof, but BDDW saw "no real progress," and the leaks worsened. (*Id.* ¶¶ 26-27.) BDDW also lacked the bargained for access to the garage and loading area; Griffel failed to provide a key until March 2020. Until then, BDDW relied on the first-floor tenant for access. (*Id.* ¶¶ 56-59.) BDDW began renting a substitute storage space sometime in 2019, and later rented a second additional property. (*Id.* ¶¶ 38-39.)

In November 2019, BDDW was still "incapable of using the space," and provided Griffel "formal written notice of its withholding of rent and cancelling of any obligations" under the lease "until the roof was repaired." (*Id.* ¶ 28.) BDDW received no response for three months and sent a representative to retrieve its remaining drawers. The representative found the property flooded, the drawers "damaged beyond repair," and the roof still in disrepair. (*Id.* ¶¶ 30, 33.) The representative returned a

few weeks later to retrieve the last of BDDW's stock and found the property's condition had again worsened. (*Id.* ¶ 35.) The flooding had also caused "significant damage" to the floor BDDW "painted and repaired at [its] own expense in anticipation of using the space." (*Id.* ¶ 36.) At this point, BDDW concluded Griffel "never had any intention of fixing the roof." (*Id.* ¶ 37.)

BDDW's representative also discovered that one of Griffel's agents had entered the property without telling BDDW, changed the lock to the second-floor hallway door without its knowledge or permission and left the third-floor door wide open. (*Id.* ¶¶ 48, 52-54.) These unauthorized entries were allegedly a repeated occurrence; Griffel also allowed one of his contractors, who he described as a "criminal" BDDW "didn't want to mess with," to enter the property without BDDW's permission. (*Id.* ¶¶ 45, 48-49.) BDDW believes this contractor is the one who changed the lock and left the door open. (*Id.* ¶ 49.)

In March 2020, Griffel told BDDW he never received its notice that it would be withholding rent until the roof was repaired, although it had been signed for by someone with the last name "Griffel." (*Id.* ¶ 41.) BDDW sent Griffel a second copy of the notice the following month. (*Id.* ¶ 42.) BDDW was ultimately "forced to vacate the [p]roperty and find other suitable storage replacements." (*Id.* ¶ 61.)

B

Griffel was insured under two nearly identical commercial general liability policies; the first running from October 19, 2018, to October 19, 2019, and the second spanning the same dates from 2019 to 2020. (Covington Mem. & Mot. Exhibits A, B, ECF No. 11) ("policy"). Coverage A under the policies insures against bodily injury and

3

property damage. (*Id.* at 85, 139.) This insurance only applies, however, if the bodily injury or property damage is caused by an "occurrence." (*Id.*) An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 99, 153.) Coverage B governs "personal and advertising injury" liability, including, in relevant part, Subsection 14c, which provides coverage for injury arising out of "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." (*Id.* at 90, 99, 144, 153.) Coverage B also contains specific policy exclusions. (*Id.* at 90-91, 144-45.)

II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 258 (1986). In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009) (quotations omitted). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (quotations omitted); *see also Goodman Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002) (quotations omitted). "The rule is no different when there

are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 Standard." *Perez v. Kwasny*, 159 F. Supp. 3d 565, 569 (E.D. Pa. 2016) (cleaned up) (quoting *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003)).

III

Under Pennsylvania law, "the interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court." *Gardner v. State Farm Fire & Ca. Co.*, 544 F.3d 553, 558 (3d Cir. 2008) (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)); *see also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) ("The interpretation of an insurance policy is a question of law"). "When the language of the policy is clear and unambiguous, we must give effect to that language." *Baumhammers*, 938 A.2d at 290 (quoting *Kvaerner*, 908 A.2d at 897). But when a provision in the policy is ambiguous, the Court construes the policy in favor of the insured. *Nationwide Mut. Ins. Co. v. CPB Int'l Inc.*, 562 F.3d 591, 595 (3d Cir. 2009) (quotations omitted).

The Court assesses the duty to defend by comparing "the four corners of the insurance contract to the four corners of the underlying complaint," taking the complaint's allegations as true and liberally construing them in favor of coverage. *Vitamin Energy, LLC v. Evanston Ins. Co.*, 22 F.4th 386, 392 (3d Cir. 2022) (cleaned up)

5

(quotations omitted). The underlying complaint's allegations control; the court does not consider extrinsic evidence. *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 251-52 (3d Cir. 2019) (quotations omitted). Any doubts about whether the claims fall within the policies' coverage are resolved in the insured's favor. *CGU Ins. v. Tyson Assocs.*, 140 F. Supp. 2d 415, 418 (E.D. Pa. 2001) (quotations omitted).

The duty to defend arises if the underlying allegations could potentially fall within the policy's coverage. *Air Prods. & Chems v. Hartford Accident & Indem. Co.*, 25 F.3d 177, 179 (3d Cir. 1994). In assessing this duty, the Court focuses on the factual allegations in the underlying complaint rather than the causes of action. *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999). Because "an insurer's duty to defend its insured in a lawsuit is broader than its duty to indemnity," if an insurer has no duty to defend the insured, it will not have a duty to indemnify them. *Ramara, Inc. v. Westfied Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016). The insured has the burden of proving coverage while the insurer has the burden of establishing that policy exclusions preclude coverage. *State Farm Fire & Cas. Co. v. Est. of Mehlman*, 598 F.3d 105, 111 (3d Cir. 2009).

### IV

### A

Covington has no duty to defend Griffel with respect to any claims for damage to the property or BDDW's materials because the underlying complaint's allegations fall outside the policies' scope. Coverage A insures against "bodily injury" and "property damage," but only if the bodily injury or property damage is caused by an "occurrence." (Covington Mem. & Mot. Exhibits A, B, 85, 139.) And again, an "occurrence" is "an

accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*) An "occurrence" must be a "fortuitous event." *Specialty Surfaces Int'l v. Cont'l Cas. Co.*, 609 F.3d 223, 231 (3d Cir. 2010). Fortuity is required because property damage and bodily injury coverage are "intended to insure against accidents," and "the key term in the ordinary definition of 'accident' is 'unexpected.'" *Kvaerner*, 908 A.2d at 898-99 (cleaned up).

BDDW claims Griffel "refused to repair the roof," even though it "its repair was an express term in the [l]ease." (Underlying Compl. ¶¶ 20-21.) BDDW repeatedly told Griffel the roof was leaking and Griffel responded, acknowledging the issues. (*Id.* ¶¶ 24-27.) But Griffel allegedly refused to repair the roof for over a year, even after BDDW formally notified him it would be withholding rent until he did (*Id.* ¶¶ 28-29.) When the property eventually flooded, BDDW concluded Griffel had never intended to fix the roof. (*Id.* ¶¶ 30-37.) That the roof was in disrepair was known to BDDW and Griffel all along—its poor condition and potential for leaks led to a specific lease provision enabling BDDW to pay half of the monthly rent until Griffel remedied the problem. (*Id.* ¶¶ 22-23.) None of the damage to property was caused by an "occurrence" because BDDW attributes the damage to Griffel's willful neglect and breach of his obligations under the lease, not "an accident or unexpected event." *See Specialty Surfaces*, 609 F.3d at 239.

B

Nor does Covington have a duty to defend Griffel with respect to claims arising out of the wrongful entry into, or eviction from, the property. Although these

allegations in the underlying complaint potentially fall within the policies' scope of coverage, they are subject to an unambiguous exclusion.

1

Coverage B insures against "personal and advertising injury" liability. (Covington Mot. & Mem. Exhibits A, B, at 90, 99, 144, 153.) Section 14 of Coverage B defines "personal and advertising injury" as injury arising out of one or more of several offenses. (*Id.* at 99, 153.) They include false arrest, detention or imprisonment; malicious prosecution; slander and libel; publication that violates a person's right of privacy; the use of another's advertising idea in an advertisement; and infringing upon another's copyright, trade dress or slogan in an advertisement. (Covington Mot. & Mem. Exhibits A, B, 90, 99, 144, 153). BDDW alleges none of these offenses.

Under Subsection c of Section 14, however, personal injury includes "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." (Covington Mot. & Mem. Exhibits A, B, 90, 99, 144, 153.) BDDW alleges "wrongful entry" because Griffel, through his agents, entered the property without giving notice to BDDW, in violation of the lease. BDDW also potentially alleges a "wrongful eviction." A constructive eviction occurs when a landlord's violation of a tenant's entitlement to quiet enjoyment "is so extreme as to interfere seriously with the lessee's ability to use the leasehold as it was intended to be used, and the violation prompts the tenant to abandon the property within a reasonable amount of time." *Sears, Roebuck & Co v. 69th St. Retail Mall, L.P.*, 126 A.3d 959, 973 (Pa. Super. Ct. 2015). A landlord's failure to make repairs, provide maintenance or

comply with local building codes can be a constructive eviction if those failures "result in substantial interference with the tenant's possession of the premises by causing a nearly total deprivation of the ability to use the premises for the purpose contemplated by the lease." *Id.* at 971 (cleaned up).

BDDW alleges it was "unable to enjoy use of the [p]roperty" because the leaking roof made it impossible to fully move in. (Underlying Compl. ¶ 20.) It also alleges Griffel denied it "unfettered access" to the property's common area and elevator and contends these issues were "fatal to [BDDW's] use of the space." (*Id.* ¶¶ 56-60.) BDDW was therefore allegedly "forced to vacate the [p]roperty and find other suitable storage replacements." (*Id.* ¶ 61.) A constructive eviction claim can be stated under these facts, and any uncertainty regarding whether "wrongful eviction" includes constructive evictions must be resolved in Griffel's favor. *CPB Int'l Inc.*, 562 F.3d at 595; *see also Cincinnati Ins. Co. v. Contemporary Distrib., Inc.*, No. 09 C 2250, 2010 WL 338943, 2010 U.S. Dist. LEXIS 6718, at *3-4, 7-12 (N.D. Ill. Jan. 26, 2010) (recognizing a duty to defend against allegations of constructive eviction under an almost identically worded coverage provision). Finally, BDDW alleges it suffered injury "arising out of" these offenses. It seeks damages in the form of its rent payments and security deposit, as well as rent it paid for substitute storage properties. (Underlying Compl. ¶¶ 87, 98.)

2

Although they potentially fall within the policies' scope of coverage, damages arising out of Griffel's wrongful entry or eviction are excluded from coverage. "An exclusionary clause is enforceable and will effectively preclude coverage as long as the policy language is clear." *Riccio v. Am. Republic. Ins. Co.*, 683 A.2d 1226, 1231 (Pa.

9

Super. Ct. 1996).  Coverage B is subject to several exclusions, one of which, "knowing violation of rights of another," precludes coverage for "'[p]ersonal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" (*Id.* Exhibits A, B, at 90, 144.)

Griffel's alleged "wrongful entry" falls within this exclusion.  BDDW alleges Griffel or his "representatives," wrongfully entered the property, knowing that doing so would violate its rights. (*Id.* ¶ 44-55.)  For instance, Griffel allowed a contractor he described as a "criminal" BDDW "didn't want to mess with," to enter the property without BDDW's permission, even though the lease expressly stated Griffel and his agents could only enter the property "at reasonable times and upon reasonable notice." (*Id.* ¶¶ 46-49.)  Moreover, this contractor or another of Griffel's agents allegedly changed a lock and tampered with others without BDDW's knowledge or permission. (*Id.* ¶¶ 49, 52-55.)  BDDW alleges Griffel "intentionally," directed these acts in order to "interfere with [BDDW's] business operations." (*Id.* ¶ 105.)

Second, BDDW's alleged "wrongful eviction" also falls within the "knowing violation" exclusion.  BDDW claims it could not use the property because Griffel did not provide access to the elevator and loading area and refused to repair the leaking roof. (*Id.* ¶¶ 22, 37, 56, 60.)  BDDW contends Griffel knew he was violating BDDW's rights. The lease required Griffel to provide access to the loading area and elevator and BDDW "repeatedly raised issues related to [its] access to the [p]roperty." (*Id.* ¶¶ 57-60.)  But for two years, Griffel allegedly denied BDDW the access he had promised. (*Id.* ¶ 59.)

Moreover, Griffel agreed to repair what he knew was a leaky roof; the lease explicitly said he would do so and even entitled BDDW to a 50% discount on the monthly rent until Griffel completed the repair.  (*Id.* ¶¶ 21-22.)  BDDW "consistently notified" Griffel of the roof's continuing deterioration and demanded he fix it.  (*Id.* ¶¶ 24-25.)  Griffel assured BDDW he would perform his duties under the lease but repeatedly "refused to repair the roof," even after BDDW informed him a second leak had begun "affecting the elevator gearbox."  (*Id.* ¶¶ 20, 25-27.)  Finally, Griffel knew he was causing injury; BDDW expressly told Griffel that the deteriorating roof and its issues accessing the property had rendered it "entirely incapable of using its leased space . . . for the full duration of the lease thus far."  (*Id.* ¶¶ 29, 41-42, 59-61.)

Because BDDW's factual allegations all either fall outside the scope of coverage or are excluded from coverage, Covington has no duty to defend it in the state court litigation.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.